UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                                               :
UNITED STATES OF AMERICA                                       :
                                                               :
            v.                                                 :   17 CR 491 (VM)
                                                               :
JAMES MOODHE,                                                  :
                                                               :
            Defendant.                                         :
                                                               :
---------------------------------------------------------------X

**SENTENCING MEMORANDUM ON BEHALF OF JAMES MOODHE**

 

Larry H. Krantz, Esq.
Nicolas J. Rovner, Esq.
KRANTZ & BERMAN LLP
747 Third Avenue, 32nd Floor
New York, NY 10017-2803
(212) 661-0009

*Attorneys for James Moodhe*

**PRELIMINARY STATEMENT**

James Moodhe will soon stand before Your Honor for sentencing. He is a good and decent man. He has accepted responsibility for engaging in insider trading, and has tried to make amends by cooperating fully and completely. We respectfully urge the Court to impose a probationary sentence. *The government takes no position on this request, and has submitted a strong 5K1.1 letter.* We submit that a probationary sentence is warranted here because, despite the seriousness of the offenses, many factors justify leniency:

*First,* Mr. Moodhe has been an exemplary cooperating witness. He made the difficult decision to admit his guilt and cooperate *within days* after learning of the SDNY investigation, and provided complete and truthful information that led to the prosecution and conviction of other individuals. He even went so far as to provide active cooperation, wearing a wire three times, an act that took great courage and yielded critical evidence for the government. Government's Sentencing Memorandum, dated November 16, 2020 ("*Govt. 5K1.1 Letter*"), at 3. This active cooperation was of great value to the government.

*Second,* this is Mr. Moodhe's first offense, and he has otherwise led a law-abiding and honest life dedicated to hard work and family. The many letters submitted with this memorandum attest to his otherwise good character and decency.

*Third,* Mr. Moodhe has endured, and will continue to endure, extraordinary family circumstances that require his presence at home. Specifically, his eldest child, Stephen, who is now 36 years old, suffers from paranoid schizophrenia and autism. Stephen's mental illness and emotional problems manifested when he was a young boy and have decimated the Moodhe family. For the past 10 years, Stephen has lived at home with his parents. He is unable to work and barely leaves the home. He is also extremely volatile and can become aggressive and violent. Mr. Moodhe is the only presence in Stephen's life willing and able to address his issues and assist him in his daily living needs. To separate Stephen from Mr. Moodhe, even for a brief period of incarceration, would be catastrophic for Stephen and other family members.

*Fourth,* the collateral consequences that Mr. Moodhe has already suffered, and will suffer forever as a result of his prosecution in this case, provide significant -- and we submit more than adequate -- punishment. He has lost his 30 plus year career in the financial services industry. He is currently working

as a school bus driver and dispatcher, earning a tiny fraction of what he made in his prior employment. He has agreed to forfeit to the government all of the gains he made through the insider trading ($2.05 million), with no offset for the losses he suffered through the same tips (approximately $1.2 million). This will leave him in financial ruin. He has also been sued by the SEC based on the same insider trading and has agreed to relief that includes an injunction prohibiting him from ever again working in the securities industry. In short, his life has already been devastated by this case.

*Fifth,* a probationary sentence would be consistent with the sentence given to the government's only other cooperator in this case (Daniel Rivas), who was sentenced by Judge Caproni to time served despite the fact that he (Rivas) was the source of the inside information, had breached his fiduciary duty to his employer, and had tipped multiple other individuals. To sentence Mr. Moodhe to a harsher sentence would create an unwarranted sentencing disparity. A probationary sentence would also be consistent with the sentences given to many other individuals who have cooperated in insider trading cases.

*Sixth,* Mr. Moodhe is 63 years old and suffers from hypertension. Given the COVID pandemic, any period of incarceration would put Mr. Moodhe's health into serious jeopardy.

For all of these reasons, we respectfully urge the Court to impose a probationary sentence.

        **A.**      **The Offense Conduct**

The offense conduct is set forth in the PSR and the Government's 5K1.1 letter. It is not complex. Over a period of three years, Mr. Moodhe – who has always been an active trader – periodically obtained material non-public information from Rivas, his daughter's boyfriend, who as a Bank of America employee had access to its internal deal tracking system containing information about potential mergers, acquisitions and tender offers. 5K1.*1 Letter*, at 2-3. In a quintessential crime of opportunity, Mr. Moodhe traded on this information through self-directed brokerage accounts and through his broker, Michael Siva. *Id*. at 5. Siva in turn executed trades based on that information for his clients and himself. *Id*. Mr. Moodhe made approximately $2.05 million in profits from the tips he received (*Id. at 5)*, although he also lost about $1.2 million trading on those same tips. The net profit to Mr. Moodhe was about $850,000.

Mr. Moodhe fully acknowledges that his conduct was wrong. He also acknowledges that when given the opportunity, he ignored his moral compass and fell prey to a desire for easy money. But it is also important to understand that Mr. Moodhe's motivation was in significant part to provide financial security for his special needs son. Specifically, despite earning a good salary through his job in the financial sector, Mr. Moodhe was under enormous and constant financial stress due to those special needs because his son has no ability to work, and likely never will. Moreover, his son is not able to live with other people, such as in a group home, because of his aggression issues. While no excuse, a part of Mr. Moodhe's motivation for the insider trading was to earn enough money to purchase a home for his son, where he could live semi-independently and away from the stresses that trigger his paranoid schizophrenia. His son's condition is explained in greater detail below.

### B. Mr. Moodhe's Substantial Cooperation with the Government

Mr. Moodhe's attempts to make amends for his misconduct have been extraordinary. In early April 2017, both Mr. Moodhe and Rivas were approached separately by the FBI. While Mr. Moodhe initially denied his guilt to the FBI, he immediately hired counsel and, within a week of that approach, decided to acknowledge his guilt and fully cooperate. *Govt. 5K1.1 Letter*, at 3. This decision, which Rivas made as well, was made *even before* any charges were filed. As his brother, an attorney admitted before this Court, writes:

> That decision to acknowledge his misdeeds and expose the full details of this insider trading scheme was extremely painful for him, knowing that he, his family members and friends would be deeply hurt … Despite those foreboding uncertainties, and the uncertainty of what his own future held, I witnessed Jim unhesitatingly follow through on his commitment to the investigators to make every effort to undue the wrongs that he had been involved in causing. *Joseph P. Moodhe, Esq. Letter*.

As discussed in in the Government's 5K1.1 letter, Mr. Moodhe provided immediate and substantial assistance to the Government:

> Within a week after he was approached by the FBI, Moodhe hired an attorney who promptly brought him in for a detailed proffer in which he candidly admitted that, for a period of years, he knowingly received MNPI from Rivas and passed the information onto Siva. The Government met with Moodhe several more times, at length, and he continued

4

> to find him forthcoming and credible. The Government observed that Moodhe came to the proffers prepared to assist the Government. He had reviewed his trading records in detail in order to provide details about the type of information he received from Rivas on each of the securities – more than three dozen in total – and whether and how he passed that information into Siva. Moodhe also agreed to cooperate proactively and recorded two in-person meetings with Siva, and attempted to record a third, all under the supervision of the FBI. Moodhe has also provided text messages he exchanged with Siva during the scheme.

*Govt. 5K1.1 Letter*, at 3.[1]

Not only did Mr. Moodhe immediately and candidly admit his own conduct to the government, but he turned over physical evidence the government did not have (text messages), *and* he agreed to become a proactive cooperator. On three separate occasions he met with the FBI and attempted to record and videotape conversations with Siva. On two of those occasions he succeeded and developed critical evidence that was ultimately used to prosecute Siva. This was an act of great courage, as Mr. Moodhe had no experience in such matters, is a naturally introverted person, and was extremely nervous as to how he would perform under such stress. Mr. Moodhe overcame his fears and did what was required of him. He worked exceptionally hard at being a cooperating witness, and the government has borne the fruits of his efforts:

> Moodhe's cooperation to the Government was significant and useful. While the Government had strong evidence of insider trading based on trading records, records from the Deal Tracking System, and phone and text messages, and Rivas, Moodhe provided the Government with a narrator and certain critical evidence, including in the form of the recordings, demonstrating that Siva had knowingly committed insider trading. As a result, in August 2017, just months after Moodhe was initially approached by law enforcement in April 2017, Rivas and Moodhe had pleaded guilty pursuant to cooperation agreements and a grand jury had returned a 54-count indictment against five additional defendants, including Siva. In sum, Moodhe's substantial assistance supported charging Siva, the defendant the Government argued at sentencing before Judge Nathan was the most culpable of the indicted defendants given the scope of his insider trading and his abuse of his position as a broker, among other factors. Furthermore, in the Government's view, the combination of Moodhe's testimony alongside the documentary evidence and the recordings caused Siva to plead guilty rather than go to trial.

*Govt. 5K1.1 Letter*, at 7-8.

In short, Mr. Moodhe's cooperation has been exemplary and extraordinary.

---

[1] Mr. Moodhe's contact (through counsel) with the USAO came only a few days after Rivas's attorney had contacted the government. This short delay was because Mr. Moodhe originally had sought to have his brother's law firm represent him, only to learn that the firm was conflicted. It then took a few days for Mr. Moodhe to locate and retain other counsel. That counsel (the undersigned) immediately approached the government on Mr. Moodhe's behalf.

### C. Mr. Moodhe's Background, Education and Work History

Under Section 3553(a)(1), the Court must consider Mr. Moodhe's "history and characteristics." In this regard, the instant offense represents a marked deviation by a man who has otherwise lived a wholly law-abiding life. Mr. Moodhe is a family man, loved and respected by his friends, colleagues and relatives.

James Moodhe is a 63-year-old United States citizen. He has no prior criminal history. He grew up as the youngest of three brothers in a lower middle-class family in Richmond Hills, Queens. The Moodhes were a closely-knit family. Mr. Moodhe's father made his living as a copy machine repair man while his mother stayed at home to raise the children. The Moodhes were devoted Catholics who attended church every Sunday.

Mr. Moodhe attended St. Frances Preparatory School, a private catholic school in Fresh Meadows, Queens. He was socially introverted, but excelled in his studies, and was a member of his high school's swimming team. Coming from a lower middle-class background, his parents could not pay for Mr. Moodhe's college. Through his swimming, he obtained a scholarship to attend Niagara University in Lewiston, New York. To support himself, Mr. Moodhe worked as a lifeguard during college. In 1979, Mr. Moodhe graduated Niagara University with a B.B.A in accounting.

Mr. Moodhe was initially hired by Paine Webber as a staff accountant but quickly rose through the ranks to be an assistant manager responsible for inventory control. It was at Paine Webber that Mr. Moodhe met Joanne, whom he married in 1982. Two years later, Mr. Moodhe and Joanne welcomed their first child, Stephen (now age 36). Stephen was followed by Kristen (now age 34) and Allison (now age 30). Between starting his first job and growing his family, Mr. Moodhe continued his studies, taking business school classes at night at St. John's University. In 1984, Mr. Moodhe graduated with an MBA in management.

Following graduation from St. John's, Mr. Moodhe worked in the financial industry for his entire career, up until this case. He worked in finance at various financial institutions and brokerage houses, including Drexel Burnham Lambert, Schroder & Co, and La Branche & Co. *Govt. 5K1.1 Letter*, at 2; PSR at ¶132. Mr. Moodhe ultimately held the positon of Controller for capital markets division of

6

Commerzbank, before joining Tullett Prebon ("Tullett") as its Treasurer and assistant controller in 2007. *Govt. 5K1.1 Letter*, at 2.  Mr. Moodhe resigned from Tullett in June 2017 because of the prosecution.  *Id*.

Mr. Moodhe's good character was evident throughout his (now lost) career in the financial services industry.  In letters we submit with this memorandum, Mr. Moodhe's friends and colleagues describe him as a devoted and hard-working colleague who would routinely go out of his way to help others. We highlight a few examples below:

- I have known James Moodhe for over ten years and he was my supervisor at La Branche and Co. for approximately [two] years… [Mr. Moodhe] was always willing to take time out of his sometimes chaotic and deadline driven day to have meetings with me whenever I needed his assistance, sometimes late into the evening. To this day I am grateful for this generosity and know that it had a key impact on several promotions that I received during my time at La Brache." *Donald Emerson Letter.*

- I met [Mr. Moodhe] in March 2007 when he first came to work at Tullett … [Mr. Moodhe] was extremely generous with his time, patient and always willing to explain and teach me and others in the department. *Georgette Bruno Letter*.

- [Mr. Moodhe] and I worked together at Tullett Prebon Americas, Inc. up until late 2016 when I left the company and we have kept in touch ever since…At work [Mr. Moodhe] was like an older brother to me providing me with guidance and protection… He managed my entire workload for over two months when I had to go on short-term disability due to a medical emergency after having been only 10 days into my new job. Upon my return [Mr. Moodhe] allowed me to ease back in before taking full charge. Not once, in all that time, did he ever make [me] feel like I 'owed him.' *Vijay Sanghvi Letter.*

- My overall opinion about [Mr. Moodhe] is that he is extremely hard-working and always looking to be as supportive for his wife and three children.  [Mr. Moodhe] always was the one person I could count on, that is why I hired him three times.  He is very loyal, professional, and thoughtful and always looks to help develop and mentor our colleagues.  Everyone I worked with on an international basis – United Kingdom, Germany, Japan and Canada; all respected and admired James. *Mark Downey Letter*.

We respectfully ask the Court to consider Mr. Moodhe's otherwise unblemished life, his admirable work history, and his devotion to friends and colleagues in fashioning a just sentence.

### D. Mr. Moodhe's Extraordinary Family Circumstances

Mr. Moodhe is a devoted father, as your Honor can see in the letters from his wife, Joanne, and his two daughters, Kristen and Allison.  Even with a demanding work schedule (as Mr. Moodhe was the primary breadwinner), Mr. Moodhe always made raising his children his top priority. As described in

7

Joanne's letter to Your Honor, when his children were young, Mr. Moodhe made time to help his children with homework, read to them at night and help them into bed: "He was and is still very active in all our children's lives. He is always there for them. He will give up something he wants to do in order to help any of them at the drop of a hat." *Joanne Moodhe Letter*.

Sadly, what has overshadowed the pleasures of Mr. Moodhe's family life is that his son Stephen suffers from severe mental illness, behavioral issues and learning disabilities. These issues have rocked the Moodhe family and caused great pain throughout Stephen's life, up through the present.

When Stephen was very young, the Moodhes learned of his attention issues and dangerous lack of judgment. Around the year 2000, during his junior year of high school, Stephen was diagnosed with Asperger's Syndrome, a form of autism; however, in the years that followed, Stephen would be diagnosed with Pervasive Developmental Disorder Not Otherwise Specified ("PDD-NOS").

Stephen's mental illnesses and emotional problems have caused the Moodhe family severe emotional and financial hardship. In his junior year of high school, Stephen was charged with assault after he attacked a special education teacher. The teacher pressed charges against Stephen, however, the case was ultimately adjourned in contemplation of dismissal. In that same year, Stephen was caught attempting to sell fake marijuana at school. Because of these incidents, Stephen's school determined that they were not equipped to deal with his emotional and behavioral issues. Ultimately, Stephen attended his final year of high school at Devereux Advanced Behavioral Health ("Devereux"), a residential treatment facility in Pennsylvania. At Deveraux, Stephen successfully completed high school.

In his early twenties, after persistent aggression and violence, Stephen was diagnosed with paranoid schizophrenia. Stephen's mental illness has been nothing short of tragic both for him and for the Moodhe family. It has prevented Stephen from maintaining any employment, and has severely affected his ability to maintain relationships with family, friends or significant others. Every attempt at independent living has proved disastrous.

Further complicating these tragic circumstances, Stephen's schizophrenia is characterized by paranoid delusions that people are conspiring against him, especially his doctors. Stephen's mistrust of

doctors has to this day made him adamantly opposed to receiving any medical treatment, and his paranoia results in his refusal to take any medication to stabilize his condition. This results in a pervasive hopelessness that the situation can never improve.

As a parent, one strives to protect and embrace their children and suffers great pain when their efforts fail. That pain became searing and unbearable in about 2003 when ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. This fact, and its disclosure, created an irreparable trauma for the family. From that point on, Kristen and Allison refused to have any meaningful relationship with Stephen. *See Kristen and Allison Moodhe Letters*. Joanne's relationship with Stephen was also irreparably harmed — leaving Mr. Moodhe as the only family member who has sustained any meaningful relationship with Stephen at all. As Kristen Moodhe writes:

> My dad is the only person that has the patience to reason with him as a result, my dad has taken on all the responsibility of caring for him. My brother has caused significant divide between my family, yet regardless of all the heartache he has caused our family, my dad continues to do his best to help him and support him. In addition to handling the emotionally and financially draining job of caring for an adult with a unique case of special needs, my dad has been working through his own problems for the last two years. No matter how tough things were for him though, he continued to put the needs of his family first. *Kristen Moodhe Letter*.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Stephen lived on the streets or with friends. He abused cocaine and heroin, which eventually led to criminal charges after he attempted to sell drugs to an undercover police officer. Stephen spent several months in jail for possession as a result. Stephen's legal woes continued after he was charged with possession of burglar's tools.

Stephen was allowed back home around 2011. Since then, Stephen has relied on his parents for housing, SSDI for income, and food stamps for sustenance. He has been without a job for years, and barely

9

ventures out of his room. Tragically, as noted above, part of Mr. Moodhe's motivation for engaging in the offense conduct was with Stephen's needs in mind. Mr. Moodhe hoped to use the proceeds of the offense to purchase a house for Stephen where he could live on his own but with assistance, and, most importantly, be away from other people in an effort to reduce the triggers of his paranoid delusions and aggression.

Since returning home in 2011, Mr. Moodhe is responsible for Stephen's day-to-day care. As Allison and Kristen discuss in their letters to the Court, Mr. Moodhe's role as a caregiver to Stephen is essential to maintaining a safe environment for Allison and Kristen, but also for Stephen as well.

> My dad is the voice of reason when it comes to handling my brother and he's the only one with enough patience and understanding to care for him. Whenever I visit my parents my dad stays home with me so I'm not alone with my brother. My dad understands and acknowledges how I feel, without me ever being vocal about it, and goes out of his way to make me feel comfortable and safe. I'm honestly scared to ever have to imagine a moment in time when my dad is not there to take care of my brother because no one else is capable of doing it." *Allison Moodhe Letter*.

Recently Mr. Moodhe has also become the primary caretaker for his wife Joanne who has significant medical conditions, which have impacted much of her daily life activities. Joanne suffers from severe pain throughout her neck, knees, and back. She has also been diagnosed with Type 2 diabetes. Due to these conditions, Mr. Moodhe has become both Joanne's and Stephen's daily caretaker, doing the vast majority of household chores including cooking, and grocery shopping.

Mr. Moodhe also served as a caregiver to his 93 year-old father-in-law, Marino, who passed away in April 2020. For the last several months of his life, Mariano lived in a nursing facility. Marino suffered from COPD and was non-verbal. Mr. Moodhe's duties included helping Marino to the bathroom, clearing his feeding tube and ensuring that he received the attention he needed from the facility's nursing staff. For months, Mr. Moodhe spent every weekend with Marino, sleeping on a cot next to his hospital bed.

As is clear, Mr. Moodhe is a proud family man and a devoted father to his three children. Mr. Moodhe has also experienced relentless hardship in his family life – no parent should have to endure the pain and anguish that the Moodhes have experienced. Yet through it all, Mr. Moodhe is still devoted to *all* of his children and still wants to see them succeed. He does his best to make sure that food is on the table, bills are paid, the house is kept up, and his family obligations are fulfilled. And despite no longer being the

10

breadwinner he once was, Mr. Moodhe has taken whatever employment he can get – including driving a school bus – to provide for his family. As stated by Mr. Moodhe's wife:

> Challenges like raising a special needs child, like Stephen, along with 2 other children will break apart most marriages but not ours. Mr. Moodhe has always been there to support me during these numerous and very difficult and challenging periods, which we still deal with on a day to day basis, as Stephen still lives in our home. *Joanne Moodhe Letter.*

Under these unique circumstances, it would be catastrophic if Mr. Moodhe were separated from Stephen, even for a brief period. He is the only family member who can effectively talk to Stephen and provide for his daily living needs. It would be painful and impossible for the family to function without Mr. Moodhe at home. We respectfully ask that Mr. Moodhe's unique family circumstances be considered by the Court in fashioning a just sentence.

### E. The Collateral Consequences Mr. Moodhe Has Suffered and Will Endure Forever

Since his arrest in this case, Mr. Moodhe has faced brutal professional, familial and financial consequences. As noted above, Mr. Moodhe had a successful 38-year career as an accountant in the finance industry. That career ended with this prosecution. With his guilty plea, Mr. Moodhe's professional reputation has been destroyed and he has lost the only career he ever knew. Mr. Moodhe resigned his position at Tullett prior to his guilty plea.

Mr. Moodhe has also been charged by the SEC for the same insider trading that is the subject of this case. He settled with the SEC and agreed to being *permanently barred from the financial industry*.[2] Needless to say his future earning potential has been devastated. As noted above, Mr. Moodhe is currently employed as a school bus driver and bus dispatcher, making about $20 per hour – a far cry from his $175,000 per year salary at Tullett. This has caused significant financial consequences for the Moodhe family. To support themselves, the Moodhes now rely on Mr. Moodhe's salary as a school bus driver and dispatcher, as well as Mrs. Moodhe's intermittent and modest income as a part-time real estate agent.

---

[2] In the Matter of James Moodhe, Administrative Proceeding File No. 3-18418.

Additionally, Mr. Moodhe will be financially devastated by his agreement with the government to forfeit gains of $2.05 million. This is a particularly onerous figure because he also suffered losses from the insider trading, in the amount of approximately $1.2 million, for a net gain of approximately $850,000. Thus, Mr. Moodhe must forfeit far more than the gain he was left with, and more than his entire current net worth. This is a great hardship and a significant punishment unto itself.

Mr. Moodhe has also suffered deep emotional consequences from his actions. Mr. Moodhe has had to explain and apologize for his actions to regain the trust of his friends and loved ones. This has been both personally embarrassing to Mr. Moodhe and a humbling experience. In the many letters submitted by family and friends of Mr. Moodhe, they write about the deep remorse and regret that Mr. Moodhe feels for his actions. *See Letter of John Moodhe; Letter of Kristen Moodhe*. In his letter to Your Honor, Mr. Moodhe expresses his own deep regret and remorse, and above all, disappointment that he failed to live up to the high moral standards he set for his children: "I am still embarrassed and ashamed for my actions and there is not one day I don't wish I could take it back." *Letter of James Moodhe*. Mr. Moodhe will for the rest of his life be branded as a convicted felon to the outside world, and he must live with the humiliation that such a label brings.

We respectfully submit that these catastrophic collateral consequences provide more than ample punishment, as well as specific and general deterrence, for purposes of sentencing. Mr. Moodhe's career in finance is over, his professional reputation is shattered, his future earnings prospects are minimal, and he lives with the embarrassment and humiliation that all of this entails. We ask that the Court take this into account when fashioning an appropriate, fair and just sentence in this case.

### F. A Probationary Sentence Will Avoid Unwarranted Sentencing Disparities.

Imposing a probationary sentence here will also avoid unwarranted sentencing disparities and thereby further federal sentencing goals. This is especially apparent in this case where the government's only other cooperating witness, Daniel Rivas, received a probationary sentence.

As noted above, Mr. Moodhe received the tips from Rivas, who was at the time his daughter's boyfriend. Rivas worked at Bank of America and had access to a proprietary database of potential mergers,

12

acquisitions and tender offers. Rivas tipped multiple other individuals, many of whom were prosecuted as part of this case.

Rivas and Moodhe were both approached by the FBI on the same day, and both quickly decided to acknowledge their guilt and fully cooperate. Following his cooperation, Rivas was sentenced by Judge Caproni to time served and two years supervised release. In light of this sentence, we respectfully submit that a probationary sentence is fully appropriate for Mr. Moodhe as well, to avoid unwarranted sentencing disparities. Indeed, Rivas's culpability was higher in certain respects, because – unlike Mr. Moodhe -- he violated his fiduciary duty to Bank of America and tipped multiple individuals.

Further, a probationary sentence is warranted based on sentences given to cooperating witnesses in other insider trading cases. Below, we have compiled a list of the sentences for eighteen cooperating defendants in insider trading cases brought in the SDNY. In each case, the cooperator faced a significant term of imprisonment; however, based on substantial cooperation, the defendant received a probationary sentence or a sentence of time-served:

| Case | Judge | Guidelines | Sentence Imposed |
|---|---|---|---|
| *United States v. Plate*, 10-cr-00056 | Hon. Richard J. Sullivan | 30-37 mos. Prison | 36 mos. Probation, 6 mos. Home Confinement |
| *United States v. Benhamou*, 11-cr-00336 | Hon. George B. Daniels | 108-135 mos. Prison | Time Served, 36 mos. Supervised Release |
| *United States v. Peterson*, 11-cr-00664 | Hon. Robert P. Patterson | Not Known | 36 mos. Probation |
| *United States v. Shankar*, 09-cr-996 | Hon. Richard J. Sullivan | Not Known | 36 mos. Probation, 6 mos. home confinement |
| *United States v. Tudor*, 09-cr-1057 | Hon. Richard J. Sullivan | 30-37 mos. Prison | 36 mos. Probation |
| *United States v. Goel*, 10-cr-00090 | Hon. Barbara S. Jones | 46-57 mos. Prison | 24 mos. Probation |

| | | | |
|---|---|---|---|
| *United States v. Fortuna*, 09-cr-01003 | Hon. Sidney H. Stein | 37-46 mos. Prison | 24 mos. Probation |
| *United States v. Barnetson*, 12-cr-157 | Hon. Kimba M. Wood | 0-6 mos. Prison | 12 mos. Probation |
| *United States v. Shah*, 12-cr-00404 | Hon. John G. Koeltl | 24-30 mos. Prison | 24 mos. Probation |
| *United States v. Barai,* 11-cr-116 | Hon. Deborah A. Batts | 57-71 mos. Prison | Time Served, 24 mos. Supervised Release |
| *United States v. Murdoch*, 08-cr-471 | Hon. Miriam Goldman Cedarbaum | 37-46 mos. Prison | 24 mos. Probation, 6 mos. home confinement |
| *United States v. Lenowitz,* 07-cr-00146 | Hon. Sidney H. Stein | 46-57 mos. Prison | Time Served, 36 mos. Supervised Release |
| *United States v. Devlin*, 08-cr-01307 | Hon. William H. Pauley | 37-46 mos. Prison | 36 mos. Probation |
| *United States v. DeVore*, 10-cr-1248 | Hon. Jed S. Rakoff | 15-21 mos. Prison | 24 mos. Probation |
| *United States v. Far*, 09-cr-01009 | Hon. Robert P. Patterson | Not Known | 24 mos. Probation |
| *United States v. Kumar*, 10-cr-00013 | Hon. Denny Chin | 87-108 mos. Prison | 24 mos. Probation |
| *United States v. Longoria*, 11-cr-00032 | Hon. Jed S. Rakoff | Not Known | 24 mos. Probation |
| *United States v. Motey*, 10-cr-01249 | Hon. Jed S. Rakoff | 18-24 mos. Prison | Time Served, 12 mos. Supervised Release |
| *United States v. Nguyen*, 11-cr-00032 | Hon. Jed S. Rakoff | 18-24 mos. Prison | 24 mos. Probation |
| *United States v. Scolaro*, 11-cr-00429 | Hon. William H. Pauley | 30-37 mos. Prison | 36 mos. Probation |
| *United States v. Shimoon,* 11-cr-00032 | Hon. Jed S. Rakoff | 37-46 mos. Prison | Time Served, 24 mos. Supervised Release |
| *United States v. Slaine,* 09-cr-01222 | Hon. Richard J. Sullivan | 46-57 mos. Prison | 36 mos. Probation |
| *United States v. Smith,* 11-cr-00079 | Hon. Jed S. Rakoff | 57-71 mos. Prison | 24 mos. Probation |
| *United States v. Wang,* 12-cr-00541 | Hon. Jed S. Rakoff | Not Known | 24 mos. Probation |

| | | | |
|---|---|---|---|
| *United States v. Freeman,* 11-cr-00116 | Hon. Jed S. Rakoff | 46-57 mos. Prison | Time Served |
| *United States v. Hardin,* 10-cr-399 | Hon. Laura Taylor Swain | 37-46 mos. Prison | Time Served |
| *United States v. Pusey,* 16-cr-00369 | Hon. Katherine Polk Failla | 10-16 mos. Prison | Time Served, 24 mos. Supervised Release |
| *United States v. Maciocio,* 16-cr-00351 | Hon. Laura Taylor Swain | 24-30 mos. Prison | Time Served, 12 mos. Supervised Release |
| *United States v. Cunniffe,* 15-cr-287 | Hon. Laura Taylor Swain | 30-37 mos. Prison | 12 mos. Probation |
| *United States v. Johnson,* 13-cr-190 | Hon. Valerie E. Caproni | 15-21 mos. Prison | Time Served, 24 mos. Supervised Release |
| *United States v. Daniel Rivas,* 17-cr-00492 | Hon. Valerie E. Caproni | 57-71 mos. Prison | Time Served, 24 mos. Supervised Release |

In light of the sentence imposed on Rivas in this case, and the sentences imposed on other cooperating defendants in unrelated insider trading cases, a probationary sentence is appropriate here to avoid unwarranted sentencing disparities.[3]

### G. A Probationary Sentence is Warranted in Light of the COVID Crisis

In addition to the above factors favoring a probationary sentence, an additional consideration is that Mr. Moodhe, as a 63 year-old male with hypertension, faces a significant COVID-19 risk were he to be incarcerated. It is well-documented that age and hypertension are significant co-morbidities with COVID-19. *United States v. Zukerman*, 451 F.Supp.3d 329, 335-336 (S.D.N.Y. 2020) (recognizing that individuals with hypertension are at increased risk for serious complications from COVID-19); *United States v. Pena*,

---

[3] Moreover, such a sentence is appropriate here, to avoid unwarranted disparities, because two *non-cooperating defendants* in this case received sentences of three months incarceration. Obviously, as a cooperating defendant -- and a proactive one at that – Mr. Moodhe has earned a less harsh sentence.

15

459 F.Supp.3d 544, 550 (S.D.N.Y. 2020) (same*); United States v. Scparta*,---F.Supp.3d---, 2020 WL 1910481, *9 (S.D.N.Y. Apr. 20, 2020) (same); *see also* Coronavirus Disease 2019 (COVID-19), People with Certain Medical Conditions, Centers for Disease Control and Prevention, (Updated Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions (noting that people with hypertension or high blood pressure have an increased risk for severe illness from COVID-19).  Given the full circumstances here, we submit that it would be unduly harsh to subject Mr. Moodhe to that risk.

For all of the foregoing reasons, we respectfully request that the Court impose a probationary sentence.

Dated:  November 16, 2020
        New York, New York


                                            Respectfully Submitted,


                                            _____
                                            Larry H. Krantz, Esq.
                                            Nicolas J. Rovner, Esq.
                                            Krantz & Berman LLP
                                            747 Third Avenue, 32nd Floor
                                            New York, New York 10017
                                            *Attorneys for Defendant James Moodhe*